RUTH M. WELCH, et al., Respondents, v. THE FRA-TERNAL AID UNION, Appellant.

In the Kansas City Court of Appeals, June 11, 1923.

1. INSURANCE: Burden of Proof: After Plaintiffs Made Out a Prima-facio Case, the Burden of Establishing Defense was Upon the Defendant. In an action to recover upon a fraternal benefit certificate, after plaintiffs made out a prima-facie case, the burden of establishing the defense was upon the defendant.

2. ———: Warranty: Where Evidence was Conflicting on Issue as to Breach of Warranty with Reference to Excessive Use of Intoxicants, Held to Raise a Question for Jury. In an action to recover upon a fraternal policy, where there was conflicting evidence between the plaintiffs and defendant as to false statements made by insured with reference to the excessive use of intoxicants, held that it was a question for the jury to say whether there was a breach of the warranty or a forfeiture of policies, and defendant was not entitled to peremptory instruction.

3. ———: Assessments: Payment: Under Evidence it was a Question for Jury to Say Whether Assessment was Paid for Month During Which Insured Died. Where the records of payments of assessments under fraternal benefit certificates were incorrect, and defendant conceded that a payment was made on May 19th, and insured was not suspended though the assessments were due and payable on the first of each months, held a question for the jury to say whether the assessment was paid for the month of June, during which month the insured died.

4. ———: Initiation: Evidence That Policies Were Issued and Delivered to Insured was Proof of Valid Contracts, Tending to Show Insured was Initiated, Placing upon Defendant the Burden of Showing the Contrary. Evidence that policies were issued and delivered to insured was sufficient proof of valid contracts, tending to show insured was initiated and placing upon the defendant the burden of showing the contrary.

5. ————: ————: Evidence Held to Make an Issue for Jury as to Whether Insured Had Been Initiated. Where the records and correspondence of defendant tended to show that insured held membership in the association, and the evidence showed that he participated in the initiation of other candidates, *held* to make an issue for the jury as to whether insured had been initiated.

6. ————: Demurrer: Proofs of Death: Where Proofs of Death Show upon Their Face a Defense to the Claim, Which is not Explained or Contradicted, a Demurrer to the Evidence Should be Sustained. Where plaintiffs proofs of death show on their face that a defense to the claim for insurance exists, which is not explained or contradicted, the same is conclusive against plaintiff, and the court should sustain a demurrer.

7. ————: Demurrer: Affidavit of Attending Physician Which was a Part of Proofs of Death, Held not Conclusive When Contradicted so as to Preclude Recovery. Where the affidavit of attending physician, which was a part of proofs of death, and which showed that the physician was the examining physician for defendant who had a few months previously approved the application of insured, *held* that the accuracy, correctness and truthfulness of same was open to question in so far as it contained statements that the excessive use of intoxicants by insured indirectly caused his death, and the same was not conclusive against the plaintiffs when explained and contradicted by other evidence as to the cause of death so as to warrant sustaining demurrer to plaintiffs evidence.

8. EVIDENCE: Conclusion: Affidavit of Local Lodge Officer Which was a Part of Proofs of Death, That Assessment was Unpaid, Held a Conclusion. An affidavit of a local officer of a lodge stating that the payment of an assessment on May 19th was for the month of May, was merely a conclusion in that regard, and not a statement which should conclude plaintiff's or even destroy their prima-facie case.

9. INSTRUCTION: Where Proofs of Death Contain Facts Admitting Defense Thereto, Although Contradicted by Evidence, an Instruction Placing Burden of Proof on Defendant With Respect Thereto is Improper. While the burden of proof is on the defendant to sustain its defense, yet if plaintiffs' proofs of death contain facts which admit such defense, but plaintiffs seek to explain and contradict such statements, then the jury should not be told that the burden of proof is on defendant.

10. ————: Evidence Held not to Conclusively Show Insured Died from Heart Disease, Thereby Reducing Amount of Recovery. Evidence *held* not to conclusively show that insured died from heart disease and that consequently recovery could not be had for more than

one-third of the amount of the policy under provision calling for reduction by two-thirds, if insured's death was caused by heart disease during first year certificate was in force.

11. **EVIDENCE: Divorce: Petition and Decree of Divorce Offered for Purpose of Showing Insured was an Habitual Drunkard, Held Properly Excluded.** Where defense to a benefit certificate was excessive use of intoxicants, it was not error to exclude record of decree of divorce granted insured's wife, and petition in the suit for divorce in which one of the grounds alleged was that insured was an habitual drunkard, since the decree may have been granted upon one of the other grounds therein, and the issue therein adjudicated was not between the parties to this action.

12. ————: **Exclusion of Letters, the Authenticity and Execution of Which Were not Proven, Held Proper.** The exclusion of letters claimed by defendant to have been written by two of the plaintiffs to the insured was proper, for their authenticity was denied, and their execution not proven.

13. ————: **Depositions of Officers of Other Insurance Companies Offered to Show, Contrary to Insured's Statements, That he Had no Insurance Therein, Held Properly Excluded.** Depositions of officers of certain other companies, offered to show that insured had no insurance in such companies, contrary to what he stated in his application, were'properly excluded, as they contained only the witnesses' conclusions that insured had no insurance therein because he had been suspended and there was no showing that there was any effort to get copies of the alleged records.

14. ————: **Initiation: Breach of Warranty: Failure to Return Assessments Paid to Insurer Held Circumstance Tending to Show Insured Had Been Initiated.** Where by-laws of fraternal order provided that if applicant was rejected for membership any advance assessments paid by him should be returned, proof of failure to return the same which admittedly were paid to the order, was a circumstance tending to show that insured was regarded as a beneficial member, and therefore had been initiated, even though the insurer was not required to return the assessments before making its defense of breach of warranty.

15. ————: **Instruction That Jury Could not Consider the Fact That Assessments Paid to Insurer Were not Returned, Held Properly Refused.** An instruction that jury could not consider the fact that assessments were not returned, *held* properly refused where that circumstance could be considered as evidence of insured's initiation, though the failure to return assessments did not prevent insurer from defending.

16. **PLEADING: Waiver: Demurrer: Objection That Petition in One Count Declared on Two Contracts or Causes of Action, Held Waived by Failing to Demur Thereto.** Where it appeared from face of petition that it declared on two contracts or causes of action, the objection that petition alleged a cause of action upon a joint contract in favor of plaintiffs and that the evidence showed that it was upon two contracts, each of which is a promise to pay a separate sum to each plaintiff, *held* waived by failing to demur thereto, as provided by sections 1226 and 1230, Revised Statutes 1919.

17. ————: **General Denial: Failure to Prove Joint Interest as Alleged, May be Taken Advantage of Under a General Denial.** The objection that the petition alleged a cause of action on a joint contract in favor of plaintiffs, whereas the evidence disclosed a several contract, goes to the matter of the proof conforming to the pleading, and defendant by general denial could avail itself of a failure to prove joint interest.

18. ————: **Answer Held to Preclude Contention That Terms of Policy Should be Construed to Show Promise to Pay Beneficiaries Separately and not Promise to Pay Aggregate Sum to Them Jointly.** Where the petition alleged that two certificates of insurance each provided that in case of death of insured the beneficiaries, three plaintiffs, should receive the different amounts of the principal sum written above the respective names of the beneficiaries, an answer alleging that if there was a valid contract the proper amount of recovery was not the full value of the certificates but one-third thereof, precluded contention by defendant that policies should be construed as a promise to pay plaintiffs separately and not a promise to pay aggregate sum therein named to plaintiffs jointly.

19. **TRIAL PRACTICE: Improper Argument: Comment by Counsel as to Failure of Insurer to Return Assessments Paid is Held not Reversible Error Where Complaint With Respect Thereto was not Mentioned in Motion for New Trial.** Argument of counsel for plaintiffs in commenting upon the fact that if insured was not a recognized member, why did not defendant return assessments it had received, in accordance with its by-laws, *held* not reversible error where complaint with respect thereto was not mentioned in motion for new trial.

20. **INSURANCE: Under Terms of Policies Insurer Held Entitled to Deduct Unpaid Assessments for Current Year.** Where insurance certificates provided that if insured died during first year the unpaid assessments for the current year should be deducted, under the verdict the insurer was entitled to have deducted an amount equal to nine assessments which had not been paid, the insured having died after payment of three assessments.

Appeal from the Circuit Court of Jackson County.—*Hon. Nelson E. Johnson*, Judge.

AFFIRMED (*conditionally*).

*J. H. Newman* and *J. W. Broaddus* for respondents.

*Geo. R. Allen* and *W. Rea Heath* for appellant.

TRIMBLE, P. J.—This is an action to recover the sum of $2000 of the defendant, a fraternal beneficiary association.

Plaintiff's petition, in one count, alleges that defendant "issued and delivered to their father, Jefferson W. Welch . . . two certificates or policies of insurance which are hereto attached, herewith filed, and marked 'Exhibit A' and 'Exhibit B,' by the terms of which it . . . promised and agreed therein to pay plaintiffs, on the death of said Jefferson W. Welch, the sum of two thousand dollars." No Exhibits or Certificates, however, were attached to or filed with the petition.

The defense was that insured in his application made false answers, which, under the by-laws, were warranties, for a breach of which the insurance would be forfeited; also that, under the by-laws, no liability arose on any certificate until the insured had been initiated, and this had not been done; also that assessments had to be paid on or before the first day of each month for which the same is levied and failure to do so automatically suspended the member and his insurance was forfeited unless reinstated in proper form under the by-laws, and that insured failed to pay the assessment for June, 1918, and was suspended therefor and was never reinstated; also that insured became addicted to the use of intoxicating liquor to such an extent as to impair his health and contribute to his death, which fact, under the by-laws, forfeited the policy.

At the conclusion of plaintiff's evidence, the defendant demurred thereto but was overruled. Thereupon it

offered its evidence, and, at the conclusion of the entire case, prayed a peremptory instruction to find for defendant which was also overruled. The jury returned a verdict for $2315.66, being the $2000 sued for with six per cent interest. Judgment was rendered thereon and defendant has appealed.

The questions to which false answers are alleged to have been made are as follows:

"16. How much insurance is now on your life? A. $5000.

"17. In what companies or societies? A. Mystic Workers, $1000; Yeoman, $2000; M. W. A. $2000.

"18. Do you use intoxicating liquors of any kind? A. No."

For a number of years prior to his death, insured had worked for several fraternal insurance companies, and on July 1, 1916, he entered into the employ of defendant as an organizer and to solicit members on a salary and commission, which employment, according to plaintiff's evidence, continued down to the date of his death, which occurred on June 19, 1918.

On February 12, 1918, he applied for $2000 insurance and requested that $1000 of it be made payable to his daughter Ruth M., $500 to his daughter Dorothy D. and $500 to his son Ernest W. In response to this application, the company wrote two policies of $1000 each; and in each of which it was provided that insured was, subject to the conditions and provisions of the certificate "entitled in case of his death to have his beneficiary, Ruth M., Dorothy D. and Ernest W. Welch, bearing relationship to said member of Daughters and Son, to receive the amount of ONE THOUSAND DOLLARS." The sum of "$500" was written over the name of Ruth M. Welch and "$250" appears in writing over each of the other two names.

These policies were "registered and delivered in Wyandotte Lodge No. 692 (Kansas City, Kansas) on April 1, 1918" as shown by the certificate of the Presi-

dent and Secretary of insured's local lodge, endorsed on said policies.

On April 23, 1918, Welch was stricken with his last illness from which he continually grew worse and finally died on June 19, 1918, as heretofore stated.

If plaintiffs made out a prima-facie case, then the burden of establishing the defense was upon defendant. [Winn v. Modern Woodmen, 157 Mo. App. 1, 11; Gooden v. Modern Woodmen, 194 Mo. App. 666; Williams v. Modern Woodmen, 221 S. W. 414.]

With reference to the defense that insured had falsely stated he did not use intoxicating liquors, the defendant introduced its "Examining Physician" for Wyandotte Lodge No. 692, Dr. Helena E. Enz, who testified that she treated insured from February 18th to the 26th, 1918, for la grippe, from which he fully recovered; that she attended him in his last illness, the date of her first visit being April 23, 1918, and her last on June 19, 1918; that at her first visit he was sitting up but was sick and was complaining of his heart; that she examined him thoroughly then and every few days afterwards; that at first she saw nothing wrong with him except the heart and she treated him accordingly; that afterwards, perhaps a week or ten days, he became jaundiced, and was troubled with nausea and vomiting, indicating liver trouble; that she then inquired of him as to his habits in regard to the use of liquor; that he at first denied it but later told her he "was a heavy drinker, had been drinking all of his life; an excessive drinker" and that he was an "habitual drunkard;" that from her first visit and throughout the time she called on him, she noticed pint whiskey bottles, some of them empty, some of them full, on the floor of his room, and that was how she came to ask about his drinking habits; she said she knew he had been drinking because those bottles were there, though she never saw him drink and he was never in her presence under the influence of liquor; that while he was suffering from acute myocarditis, an inflamma-

tion of the muscular structure of the heart, and died of that disease, yet the liver condition caused a toxic condition which affected the heart and that caused his death. She further testified that his liver trouble was cirrhosis or hardening of the liver; that it could be caused by alcoholism and syphilis, and that a number of things could, and some infectious diseases would, cause it; that she did not know how many things could cause it; that prior to the development of the symptoms of liver trouble, she didn't know that he had cirrhosis of the liver; that she didn't remember what she treated him with as she kept no record, but that she gave him heart stimulants, for his heart was very weak; that she concluded, from what he told her as to his habits, that he had cirrhosis of the liver, after the swelling or dropsical condition together with nausea and jaundice appeared; the only way one could ascertain the cause of cirrhosis of the liver would be to hold an autopsy, remove the organ and examine it, "except you get it from his history, he can tell you; he knows what he has been doing." and "He (Welch) told me what it came from, he told me he was drinking and I knew that was where it came from." This witness further testified that a "division manager" of defendant called her to attend Welch during his last illness, and that she asked this man to guarantee her pay for her services and that he did so. She did not keep any record or chart of Welch's physical condition, and had no chart thereof nor record of what she gave him, nor could she remember what medicines she gave him.

This witness was, and had been for a long time, one of defendant's examining physicians, and she examined insured when he applied for the insurance. The report of this examination made out in her own handwriting on February 12, 1918, stated that she had personally known Welch for two years, that his appearance indicated sound health, with no indications of past or present use of intoxicants, no indications of heart disease, and she recommended him as a "safe and first-class insurance risk."

She admitted this at the trial and said that at that time he was "just the picture of health" and showed no indications of alcoholic habits. Although, in the report of her medical examination of him at the time of his application on February 12, 1918, she had stated she had known Welch for *two years,* yet in her "attending Physician's affidavit," made out at some time, not shown by the record but of course, after his death, she stated she had known him only since *January, 1918,* and at the trial said that was the *first time she ever saw him.*

The above mentioned "Attending Physician's Affidavit, as heretofore stated, was not introduced as a part of the proofs of loss, but was offered in evidence by defendant at a time different from that in which it offered plaintiffs' proofs of loss, and as a different exhibit altogether. In this affidavit Dr. Enz also stated that she treated deceased for acute myocarditis and that this was the final cause of death, with cirrhosis of the liver as the primary or predisposing cause, the date or origin of which last disease she did not know; that deceased used alcohol to excess, and this contributed "indirectly" to his death. Dr. Enz testified at the trial that she did not know who got her to make the above affidavit, but that it came to her through the mail and was sent to her by "some lawyer." The record does not disclose whether she was sworn to it or not, nor, if so, by whom it was done. The record of the proofs of death calls for "Blank No. 2—Is attending Physician's affidavit marked Exhibit 4, Page 43 of Bill of Exceptions." But the record does not show any "Exhibit 4," while the "attending Physician's affidavit" above referred to appears as a part of Exhibit 3.

The evidence shows that when insured's condition got desperate, Dr. Enz called in another physician, Dr. Ray. He testified as a witness for defendant and says he saw insured only twice, once in his room and again at a hospital to which he was removed; that he couldn't say how long he was in his room on his first visit, but

thought it was half an hour; that he examined the patient's heart, took the covers off and found him in a general dropsical condition, abdomen and legs badly swollen, his heart weak and irregular and the whites of his eyes yellow and the patient complained of a pain in the region of the heart; that he didn't know how long the liver trouble had existed; that he didn't remember of any other condition than those he had described and did not see any vomiting; that swelling of the limbs and abdomen could come from other causes than liver trouble; that he didn't think there would have been any heart trouble if it had not been for the liver trouble "but I don't know that," and he "attributed his heart disease to the condition of his system, and it all went back to his habits, and the habits produced the liver trouble, and vitiated his blood stream, and that poisoned his heart;" that the patient "probably would not" have had heart trouble if it had not been for the liver trouble; that he saw no whisky bottles in the room, nor did he see anything in Welch's conversation, appearance, or demeanor to indicate his drinking except that the patient told him he had been a drinker; that he didn't remember what the patient said to him in this regard; that he couldn't remember what he asked Welch or what Welch told him, but "I am sure I asked him; I asked that (about his drinking habits) on general principles. I am sure I asked him;" that the immediate cause of his death was acute myocarditis, and if he were called upon to make out a death certificate he would say the heart trouble was the primary cause and the liver trouble the secondary cause.

The defendant also introduced its "Division Manager" who was and had been for eight or ten years in the employ of defendant, and who had supervision over Welch as one of defendant's solicitors. He testified that "along in or about that time" (after May 1, 1918) "he (Welch) was drinking terrible. I suppose most of us know when a man is drunk." He further testified as to

his prior drunkenness and drinking habits. Two other employees of defendant testified to his intemperate habits, saying that they had seen him drunk for a week at a time.

There was evidence, however, in plaintiffs' behalf tending to prove the contrary. Among these were his daughter Ruth who saw him frequently up to and after he took sick; also the owner of the hotel where insured roomed. They say they never saw him under the influence of liquor or take a drink; and the hotel proprietor says after Welch took sick he was in his room every day and saw no whisky bottles. And one of defendant's witnesses, who was not, at the time of the trial, an employee of defendant, having left its service some three years prior thereto, testified he was in insured's room twice while he was sick and he saw no whiskey bottles.

It would seem to be clear that, under the foregoing state of the record, it was a question for the jury to say whether there was a breach of the warranty or a forfeiture of the policies, in the regard now being considered. So far as concerns the physicians' testimony, they disagree among themselves as to the presence of whiskey bottles in the room of insured, who was at the time divorced from his wife and living alone, that is, at a hotel in a room to himself. Also it is a fair inference from Dr. Enz's testimony that she came to the conclusion insured had cirrhosis of the liver from what she says he finally admitted to her were his habits in regard to drinking. From this and other circumstances apparent upon the face of the record, it was also for the jury to say whether the doctors' statement that he died from a condition brought on by cirrhosis of the liver and that this was from the excessive use of alcohol was true or not; and it was also for the jury to say whether they would believe that insured admitted he was an habitual drunkard or had intemperate habits.

With reference to the defense of nonpayment of the assessment of June, 1918, the defendant introduced a

book entitled "Monthly Report, Fraternal Aid Union" as the book in which the local secretary of the subordinate lodge made the monthly report of collections to the home office and the payments made by each member for the months of January, February, March, April, May and June, 1918. After that book was made up, it was sent to and held by the Supreme Lodge and became part of its records. Defendant's evidence shows that during these months a Mrs. Lugar was the local secretary, appointed by the Supreme President with the concurrence of the Advisory Board of the Supreme Lodge; that the book offered in evidence was made up and kept partly by her and partly by her sixteen-year old daughter, who at that time held no official position with the lodge. The mother at the time of the trial was dead. The payments made by the members were not entered in the above book immediately nor until it came time to send the monthly report to the Home Office. The Monthly report for May, 1918, was not sent in until July 5th and the June, 1918, report was sent on July 19th. If a member failed to pay his monthly assessment, the local secretary placed after his name in the Monthly Report Book a letter S in *blue* pencil, indicating suspension, and when the report reached the Supreme Secretary he placed after the name, and after the blue S, a *red* S indicating suspension by the Supreme Secretary. The evidence shows that no *blue* S was placed after insured's name by the local secretary, and that only a *red* S was placed there by the Supreme Secretary after July 5, 1918, which, of course, was *after insured's death.* The laws of the defendant required the local secretary to issue an official receipt from a receipt book furnished by the Supreme Lodge, for every payment made, and the "stub" of each receipt remaining in the book was an abstract or duplicate thereof. It was conceded by defendant that *two* assessments were paid on deceased's insurance, but the official receipt book introduced in evidence by defendant contained only the "stub" for the April payment which was the only offi-

cial receipt the beneficiaries had; and the daughter of the local secretary could not remember whether receipts were given for the two *conceded* payments or not. The Monthly Report Book showed after Welch's name in the column under *March* "$4.70", under April "Pd. 4.70", and under May "Pd.", and "Dead" was written in both the May and June columns, while under the January and February columns was written "No date of death marked dead." As Welch did not become insured until April 1, manifestly the payment of $4.70 set down in the *March* column was erroneous. While this might indicate only that the two payments of $4.70 each shown on the books should have been put down under the columns of April and May instead of March and April, yet the assessments were due on or before the first of each month, and the defendant's evidence is that the two assessments conceded to have been paid were paid *by others for Welch*. The assessment for April was paid on the first of April and at this time Welch was in good health, so that presumably he paid that himself and the two paid *by others for him* were the two that were paid *after he got sick*. As the assessments were due on the 1st of each month and the last of the conceded payments was made on May 19th, the jury could say this payment was for June instead of for the May assessment. So that the receipt held by the beneficiaries for April and the two payments conceded by defendant, for which the secretary was not able to say whether receipts were given or not, together with the fact that no suspension was marked by the local secretary and that the book was not made up nor sent in until after insured's death, and the other circumstances affecting the correctness and reliability of the record, would seem to leave it a question for the jury to say whether the June assessment was paid or not, and hence we would not be justified in saying that conclusively the June assessment was not paid.

As to whether Welch was ever initiated, we are of the opinion that this was clearly a question for the jury.

Plaintiffs showed that the policies were issued and delivered. This was evidence of valid contracts, placing on defendant the burden of showing the contrary. [Fisher v. Supreme Lodge Knights and Ladies of Honor, 190 Mo. App. 606, 615.] See also on this point Golding v. Modern Woodmen, decided by this court January 20, 1923, but not yet published. Besides, while defendant had evidence of witnesses who testified that they never saw insured present himself for initiation in the lodge between April 1, and July 1, 1918, yet plaintiffs introduced witnesses who testify that they saw Welch in the lodge room where work was being done, and one of these says Welch was *directing the initiation* of candidates, and certainly this would not have been allowed if he himself had not been initiated. Besides, the records of the defendant introduced in evidence and the correspondence of defendant tend to show that Welch "held membership" in the lodge.

As to all of the foregoing defenses the burden of proof was on defendant; there was evidence in the case on all of these matters sufficient to make an issue for the jury in regard to them. Hence we should not say that no case was made which was submissible. [Foster v. Metropolitan Life Ins. Co., 233 S. W. 499, 500; Lafferty v. Kansas City Casualty Co., 229 S. W. 750; State ex rel. v. Reynolds, 277 Mo. 14, 21; Bray v. American, etc., Assurance Co., 238 S. W. 1093, 1095.]

There is no doubt of the rule that where plaintiff's proofs of death show on their face that a defense to the claim for insurance exists, and this showing is not *explained* or *contradicted,* the same is conclusive against plaintiff and the court should sustain a demurrer. [Costens v. Supreme Lodge Knights & Ladies of Honor, 190 Mo. 57.] With reference, however, to the statements in the "attending physician's affidavit" as to deceased's habits and their being indirectly the cause of his death, if said affidavit be a part of the proofs of death, the record, as we have heretofore shown, discloses sufficient

evidence to call in question not only the disinterested-
ness of the statements, but also their accuracy, correct-
ness and truthfulness, and therefore to leave the ques-
tion of a forfeiture of the policies an issue for the
jury. [Clarkston v. Metropolitan Life Ins. Co., 190 Mo.
App. 624; Thompson v. Business Men's Accident Assn.,
231 S. W. 1049, 1052; Renfry v. Mutual Life Ins. Co.,
196 S. W. 775, 778.]

It is true, among these proofs of death was a pur-
ported affidavit of the President, Treasurer and Sec-
retary of the local lodge (but which the record does not
show whether it was or was not signed or sworn to),
which not only says "Jefferson W. Welch . . . was
at the time of his death a member of the Lodge," and
that he "was admitted to membership on the 1st day of
April, 1918," but also contains the further statement
that "The last assessment for the deceased was paid on
the 19th of May, 1918, for the month of May, 1918   The
preceding assessment was paid on the 1st of April for the
month of April, 1918." Now, aside from any question as
to how such a statement can properly have any place in
a proof of death, of which there is no showing, it is sin-
gular that the statement should be made that the payment
of April 1st is *for the month of April* and the payment
of May 19th is *for the month of May*." Manifestly, the
thing bears on its face an inference which the jury
could find that it was inserted there to *interpret and cor-
rect* the incorrect entry in the Monthly Report Book which
has been heretofore discussed; and, clearly, too, the
statement that the payment of May 19th was for the
month of May, when, if it was, it was nineteen days too
late, is nothing more than the officers' *conclusion* in that
regard and not the statement of a *fact* which should con-
clude plaintiffs' or even destroy their prima-facie case in
that regard.

The insurance contract as made by the by-laws pro-
vided that if insured died, within one year, of heart dis-
ease, then the liability should not exceed one-third of
the face of the certificate; also that the unpaid assess-

ments for the current year should be deducted. Plaintiffs' instruction 1 told the jury the plaintiffs were "entitled to recover the full amount of said policies with interest thereon at the rate of six per cent per annum from the 5th day of August, 1919 (the date suit was brought), unless you further find" one or more of the defenses of non-initiation, failure to pay dues, false statements in his application, and excessive use of alcoholic liquors which contributed to his death; and that the burden was on defendant to prove one or more of these things.

The instruction then told the jury that in this connection the defendant sought to avoid payment of the full amount of the policies because insured died of heart disease, but that before they could reduce recovery on that ground defendant must prove by the greater weight of the credible evidence that deceased did die of heart disease, but that if they believed insured was afflicted with hardening of the liver which progressed to such an extent as to affect his heart and that except for the disease of the liver, his heart was normal and healthy, they could not find for defendant on that issue.

The first objection to this instruction is that it erroneously placed the burden of proof on defendant to sustain its defenses or any one of them. It is well established that, while the burden of proof is on defendant to establish its defense, yet if plaintiff's proofs of death contain facts which admit such defense, but plaintiff seeks to explain or contradict such statements, then the jury should not be told that the burden of proof is on defendant. [Weise v. Sovereign Camp Woodmen of the World, 207 S. W. 249; Tuepker v. Sovereign Camp W. O. W., 226 S. W. 1002, 1004.] But, as heretofore shown, how can it be said, in view of the state the record is in, that plaintiffs' proofs of death admitted any defense so as to change the burden of proof?

As to the claim that there was not evidence to justify the submission to the jury of the question whether

insured died of heart disease, calling for a reduction in the amount of recovery to only one-third of the $2000, it would seem that the evidence of the two physicians, taken as a whole, left it a matter of considerable doubt as to just what disease insured did die of. Hence the instruction in that regard was not without evidence to support it, nor can we say that, conclusively, insured died of heart disease and that consequently recovery could not be had for more than one-third of the $2000 less the remainder of the unpaid annual payment for the current year in which he died.

Defendant offered in evidence the record of a decree of divorce obtained by insured's wife June 27, 1914, which, however, did not show, in itself, the ground on which the divorce was granted. The court excluded it. Later on, the defendant offered in evidence the petition in the suit for divorce, and *one* of the grounds alleged therein was that the husband was an habitual drunkard. This was also excluded. The purpose in offering this was stated to be to contradict insured's statement that he had not used intoxicants within five years. But this defense was not pleaded and hence was not in the case. Moreover, the decree of divorce may have been granted upon one of the other grounds mentioned in the petition, and the issue therein adjudicated was not between the parties to this suit. We see no error in the exclusion of this evidence.

The exclusion of the letters claimed by defendant to have been written by two of the plaintiffs to the insured was proper, for their authenticity was denied, and their execution was not proven.

The depositions of officers of certain other companies, outside of the State, offered to show that insured had no insurance in other companies contrary to what he stated in his application, were properly excluded. The depositions contained only the witnesses' conclusions that insured had no insurance therein because he had been suspended. There was no showing that there was any effort

to get copies of the alleged records. [Radford v. Horton, 227 S. W. 1073, 1076; State v. Lentz, 184 Mo. 223, 242.]

While defendant did not have to return the premiums paid in order to be in a position to defend on the ground of a breach of warranty (State ex rel. v. Reynolds, 229 S. W. 1057), yet its by-laws provided that if an applicant was rejected for beneficial membership, any advance assessments paid by him should be returned. The claim was that insured never became a member, because he was never initiated. Since the by-laws required the return of the assessments it would seem that the failure to obey the by-laws by returning the premium was a circumstance, which the plaintiffs could prove and comment upon, as tending to show that he was regarded as a beneficial member and therefore had been initiated. Defendant's refused instruction H. on this matter, however, did more than say that the failure to return did not prevent the company from defending. It said the jury could not consider the fact that the assessments were not returned. Hence it was properly refused.

It is urged that the petition in effect alleges a cause of action on a *joint* contract in favor of all the plaintiffs; while the evidence shows that it is upon two contracts, each of which is a promise to pay a separate sum to each plaintiff. So far as the petition in one count declaring on two contracts or causes of action is concerned, this appeared on the face of the petition, and, under sections 1226 and 1230, Revised Statutes 1919, the defendant, by failing to demur, has waived such defect.

But the objection above mentioned is not to a misjoinder or a defect of parties; it goes to the matter of the *proof* conforming to the *pleading*. As said in Yore v. Yore, 240 Mo. 451, 462, "if the proof shows that the obligation from the defendant to the plaintiffs is not to one of them jointly, but severally, then there is a failure of proof under the petition." And under its general denial, defendant could avail itself of a failure to prove

joint interest, and a failure to demur or answer does not obviate the difficulty. [Wintergerst v. Court of Honor, 185 Mo. App. 373, 391.]

However, under the circumstances of this case, can it be said that the evidence discloses a several and not a joint contract? We think the contention now raised is in direct conflict with the answer. The petition alleged that the policies each provided that the insured was, subject to the provisions of the contract, "entitled, in case of his death, to have his beneficiary Ruth M., Dorothy D. & Ernest W. Welch, bearing relationship to said member of Daughters and Son, to receive the sum of ONE THOUSAND DOLLARS." The answer denied that there was any insurance contract at all, but set up that if there was a valid insurance contract and if plaintiffs' father was "a member in good standing" with his insurance "in full force and effect at the time of his death," then the "true and proper amount of recovery is not $2000," but, under the clause relating to death within one year from heart disease, was reduced to "one-third the face of the certificate, to-wit, $666.66" and that this amount was to be still further reduced by the clause deducting the unpaid assessments for the current year, "leaving the full amount (due) only that hereinbefore set forth, to-wit, $619.66." If the placing of the different amounts above the respective names of the beneficiaries in the two policies might otherwise be construed as a promise to pay the plaintiffs separately and not a promise to pay the aggregate sum therein named to the plaintiffs jointly, it would seem that the defendant's answer completely negatives such a construction. It cannot be said that the answer was given in ignorance of the true facts, for the defendant knew the terms of its promises. The demurrers offered to the evidence were general and not special, and hence the trial court had no notice from them of any contention such as is now made. To sustain the objection based on this point would be to sanction a construction of the insurance contracts

which is directly contrary to the construction authorized by defendant's answer. It would also be palpably unfair to the trial court.

It is urged that reversible error was committed in the argument of counsel for plaintiffs in commenting upon the fact that if Welch was not a recognized member, why did not, defendant return the assessments it had received, in accordance with its by-laws. We see no reversible error in this. However, we find upon examination of the record that the arguments of which complaint is made in the brief are not mentioned or set forth in the motion for new trial.

The record discloses, however, that under the insurance contract the amount of the unpaid assessments for the current year should be deducted. The monthly assessments on both policies was $4.70. And, under the verdict, nine of these were not yet paid. Hence the judgment should be reduced by the sum of nine times $4.70 or $42.30, with interest thereon at six per cent from August 5, 1919, the date of the institution of plaintiffs' suit.

Plaintiffs must, therefore, enter a remittitur of the above amount with interest, or the judgment will be reversed and remanded. If said remittitur is filed within twenty-five days from the date of the announcement of this opinion, the judgment will stand affirmed; otherwise, it will be disposed of as above indicated. All concur.